UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 20-CR-80025-MIDDLEBROOKS

UNITED STATES OF AMERICA,
    Plaintiff,

vs.

ROBERT DANIEL SOLOVE,
    Defendant.
_____/

# DEFENDANT'S MOTION FOR DOWNWARD VARIANCE & SENTENCING MEMORANDUM

> Sentencing, that is to say punishment, is perhaps the most difficult task of a trial court judge. While there are many competing considerations in every sentencing decision, a sentencing judge must have some understanding of the diverse frailties of humankind. In deciding what sentence will be "sufficient, but not greater than necessary" to further the goals of punishment, a sentencing judge must have a generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain.

*United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017)(internal quotation marks and citations omitted).

### A. This Court should avoid sentencing Mr. Solove more severely than other defendants whose conduct was as egregious, or more, than his own.

The Sentencing Guidelines evince Congress' goal of "proportionality in sentencing" based on offense severity. U.S.S.G. § 1A1.3. In other words, Congress sought harsher punishment for more heinous acts.

William Irey raped, sodomized, and sexually tortured more than fifty young girls between 4-6 years old for more than 5 years. *United States v. Irey*, 612 F.3d 1160,

1

1166 (2010). He travelled to Cambodia and other Asian countries where he would visit brothels to engage in sex with these "abjectly impoverished" children, purchasing two or three at a time. *Id.* at 1166. He recorded their defilement and humiliation and then distributed them online. *Id.* at 1168. His images are "some of the most graphic and disturbing child pornography that has ever turned up on the internet." *Id.* at 1166. They depict him receiving and performing oral sex on prepubescent girls and engaging in anal and vaginal intercourse with them. *Id.* at 1167. They show toddlers with vulgar writing on their bodies and others he tied up and bound with duct tape. *Id.* They memorialize Irey inserting plastic glow sticks, dildos, cockroaches and candy into their vaginal cavities and posing with the children as trophies. *Id.* at 1167-68. "In some of the images he can actually be seen smiling as he inflicts the sexual abuse." *Id.* at 1168. William Irey is serving a 360-month prison sentence.

Jack Dean sexually abused his stepdaughter from the time she was eleven until she was twenty-seven. *United States v. Dean*, 635 F.3d 1200, 1202 (11th Cir. 2011). He recorded 243 videos of her, more than 50 while she was still a minor. *Id.* When the abuse began, he recorded himself digitally and orally penetrating her vagina while she slept. *Id.* Later, he instructed his own minor daughters to record the victim naked, engaged in vaginal sex with her, and invited other men to join him. *Id.* He also beat her until she cried and begged him to stop. *Id.* at 1203. Dean's victim required three rectal surgeries to repair damage he did to her during these encounters. *Id.* He coerced her compliance with threats to kill her, her mother, and

her husband. *Id*. His final act of abuse occurred when he tied her to a wall and violently penetrated her vagina with a bottle. *Id*. Jack Dean also is serving a 360-month prison sentence.

John Latimer video recorded himself penetrating his daughter's vagina with his finger and his penis. *United States v. Latimer*, 828 Fed.Appx. 673 (2020). She was 2 years old. Tr. Sent., *United States v. Latimer*, 18-CR-00278-MHC-JKL, DE 52 at 14 (N.D. Ga.). He also possessed more than 5,000 images and more than 100 videos of adult men sexually abusing young girls. 828 Fed.Appx. at 674. He is serving a 300-month prison sentence. *Id*.

While unconscionable, Mr. Solove's conduct was not as egregious as Irey's or Dean's and was most similar to Latimer's. In light of Congress' proportionality concerns, this Court should consider their sentences in determining his.

**B. It is fundamentally unfair to let the government manipulate sentencing outcomes for similarly situated offenders with its charging decisions.**

Through the sentencing guidelines, Congress also sought "reasonable uniformity in sentencing by narrowing the wide disparity in sentences imposed for similar criminal offenses committed by similar offenders." U.S.S.G. § 1A1.3. Likewise, section 3553(a) notes the need for the sentencing court "to avoid unwarranted disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). In short, Congress wanted similarly situated offenders to receive similar sentences. Despite this clear goal, prosecutors retain unfettered charging discretion and with it, the ability to unfairly manipulate

3

sentencing outcomes.

Currently, the same prosecutor has brought two cases before this Court involving the production and distribution of child pornography. In both cases, a parent committed a sexual act with their minor child, memorialized that act with an image, and then distributed that image online. Both parents initially lied to law enforcement, telling agents they had created the "fake" images using computer software. In one case, the defendant also engaged in an online, non-contact, sexual relationship with another minor child. In the other, the defendant contracted with another adult to engage in additional sexual acts with both of her minor children. Both defendants pled guilty, but because of the prosecutor's charging decisions, one of them, Mr. Solove, now faces 120 years in prison while the other, Tonya Bagley, faces just 35 years. *See United States v. Tonya Bagley*, 20-CR-80069-DMM.[1] This result is fundamentally unfair.

### C. This Court can reasonably protect the public without sending Mr. Solove to prison for the rest of his life.

In line with other studies, the Sentencing Commission has found one factor that negatively correlates with recidivism is the offender's age at the time of release. United States Sentencing Commission, *Recidivism Among Federal Offenders: A Comprehensive Overview*, 19-23 (2016) ("2016 Report"); United States Sentencing

---

[1] The prosecutor charged Ms. Bagley in a two-count information with conspiracy to produce child pornography and using interstate facilities to transmit information about a minor. By contrast, he charged Mr. Solove in a 17-count indictment whereby he faced two life sentences plus 350 years in prison. At a minimum, he could have also charged Ms. Bagley with production and distribution of child pornography. Doing so would have increased her exposure by at least 50 years.

4

Commission, *The Effects of Aging on Recidivism Among Federal Offenders,* 30 (2017) ("December, 2017 Report")(finding "older offenders are substantially less likely to recidivate following release compared to younger cohorts"). The Commission found offenders 60 years old or older at the time of release had a re-arrest rate of just 16% while the rate for offenders under 21 was more than 67%. *Id.* at 23.

Sexual offenders are no exception to this rule. Studies consistently have found they too are less likely to reoffend as they age. *See* R.K. Hanson, Recidivism and Age: Follow-Up Data from 4,673 Sexual Offenders, *Journal of Interpersonal Violence*, 17, 1046-62 (October 1, 2002); Hanson, R.K., & Bussiere, M.T., "Predicting relapse: a meta-analysis of sexual offender recidivism studies," *Journal of Consulting and Clinical Psychology*, 66, 348-62 (April, 1998); A.J.R. Harris & R.K. Hanson, "Sex Offender Recidivism: A Simple Question," (2004); R. Blanchard, R. & H.E. Barbaree, H.E., "The Strength of Sexual Arousal as a Function of the Age of the Sex Offender: Comparisons Among Pedophiles, Hebephiles, and Teleiophiles," *Sexual Abuse: A Journal of Research and Treatment*, 17, 441-456 (2005); S. Fazel, G. Sjostedt, N. Langstrom, & M. Grann, "Risk factors for criminal recidivism in older sexual offenders," *Sexual Abuse: A Journal of Research and Treatment*, 18, 159-167 (2006). In fact, at least one study found sexual offenders released after age 60 had a recidivism rate of just 3.8%, significantly lower than the 17.5% average for all sexual offenders. *See* Hanson, 2002.

Though no one can predict whether Mr. Solove will reoffend upon release from prison, the government will likely ask this Court to decide now that he will always be

5

too dangerous to release. Federal law provides a better option. The Adam Walsh Act permits the government to seek continued detention at the end of a sexual offender's prison sentence if it believes he remains sexually dangerous at that time. 18 U.S.C. § 4248. Thus, this Court need not decide today whether it must detain Mr. Solove forever to protect society from him in the future. It can wait to see what impact a shorter, but still lengthy, prison sentence has on him before deciding whether he is too dangerous to release.

This Court can also order supervised release for the rest of Mr. Solove's life, allowing probation to monitor his behavior with the constant threat of additional incarceration if he fails to comply. Moreover, regardless of any term of supervised release, federal law and all state laws require Mr. Solove register as a sexual offender upon his release from prison. As such, any community in which he chooses to live will be aware of any remaining danger he may present and law enforcement can monitor him accordingly. Simply stated, this Court need not incarcerate Mr. Solove for the rest of his life to protect society from him.

D. **"Mercy bears richer fruits than strict justice." ~ Abraham Lincoln**

While "[m]ercy is seldom included on the list of "traditional" rationales for sentencing," section 3553 evinces Congress' intent – this Court should impose the "lowest possible penalty consistent with the goals of sentencing." *United States v Blarek*, 7 F.Supp.2d 192, 210 (E.D.N.Y. 1998); *See also* 18 U.S.C. §3553(a). "The notion that undue harshness should be avoided by those sitting in judgment has long

been a part of the human fabric and spirit. Lenity is often the desirable route." *Id*. Here, Mr. Solove seeks to provide this Court with some reasons to consider mercy.[2]

Mr. Solove's father, Randy Consentino, was an illiterate cocaine addict with a full-scale IQ of 73. He had grown up in poverty, dropped out of high school in the eleventh grade, was "socially maladjusted," and often unemployed, relying on food stamps and SSI to survive. Mr. Solove's mother, Carol, left school after ninth grade, at age 15, to marry his father. She too was addicted to cocaine, intellectually disabled, and very dependent on her husband. Her traumatic childhood, low mental functioning, and history of poor judgment made it difficult for her to know how to be a good mother.

The Commonwealth of Pennsylvania began to provide services for Mr. Solove's family seven years before he was born. When his oldest brother, Randy, Jr., came home from the hospital, he had swelling on his head. The Commonwealth tried to monitor this situation, but his parents repeatedly missed appointments and refused services. After about eight months, the Commonwealth determined Randy, Jr. was clean and healthy and gave up.

---

[2] The Court can find all of the information in this section either in the PSR or in the approximately 1400 pages of records in Exhibit A, attached under seal. These records document Mr. Solove's life prior to age 18 and include documents from Northhampton Children and Youth Services, Pennsylvania Children and Youth Services, and school records. Undersigned previously provided all of these records, and others, to probation. For ease of reference, the Court may want to refer to Exhibits A-1 and A-2. Counsel extracted these documents from Exhibit A because they provide a reasonable summary of the facts contained in the remainder of Exhibit A. Exhibit A-1 is a child profile drafted in anticipation of Mr. Solove's adoption at age five. Exhibit A-1 is a transfer summery his caseworker wrote when he was 12 after child services closed its case.

Four years later, they offered services again. By then, Mr. Solove's sister, Jessica, and his other older brother, Richy, had been born. This time, someone alleged the parents were abusing drugs and neglecting the children. Apparently, they were not properly supervising, clothing, or immunizing them.

They were still receiving services in December when Mr. Solove's father drove his family into a tree two days before Christmas. Both he and Mr. Solove's mother were under the influence of cocaine. None of the children had been wearing seatbelts. The crash killed Randy, Jr. and severely injured the rest of the family. Mr. Solove's father initially faced homicide charges related to Randy, Jr.'s death, but later pled guilty to driving under the influence. The Commonwealth placed the surviving children into foster care the day after Christmas, commencing a years-long court proceeding concerning whether or not to terminate parental rights.

Mr. Solove was born on July 24, 1992, in the midst of that proceeding. At the time, his parents retained custody of him. After his brother, Raymond, was born a few years later, the situation deteriorated rapidly. Both before and after the boys were born, the surviving Consentino children moved from foster family to foster family. At times, the court reunited them with their biological parents, but the reunions were often short-lived because mom and dad could not stay sober. Drug dealers often visited their home, they could not account for most of their income, and they repeatedly tested positive.

There was another problem. Carol's brother and father were pedophiles. Though the Commonwealth urged, and the court repeatedly ordered, the Consentinos

8

to keep these men away from the children, they refused. Richy told school friends his uncle had sexually abused him. Mr. Consentino admitted witnessing his father-in-law sexually abuse a friend's child while he did nothing to stop the abuse.

By the time Mr. Solove was four-years old, the Commonwealth had had enough. Mr. Solove and Raymond's first foster parents were Mr. and Mrs. Morales. It did not go well. Mr. Solove acted out, smearing feces, writing on walls, removing and tearing bed linens, and wetting himself. He also exhibited possible intellectual deficits - despite his age, he did not know his colors nor how to dress himself. They took him to see a psychiatrist who recommended counseling, IQ testing, and more structure. Mr. and Mrs. Morales eventually gave up on Mr. Solove and Raymond and sent them back for new placement.

The Allams were next, but the result was the same. Mr. Solove's negative behavior continued. Now, he also acted out sexually, exposing himself to his foster sister and trying to touch his foster brother. At night, when he was supposed to be sleeping, the Allams noticed he appeared to keep watch, routinely sitting up and staring at them when they would check on him. He was more knowledgeable about sexual matters than a four-year old should have been. And, they had seen his older brother, Richy, touch him inappropriately. They believed something had happened to these boys.

They brought Mr. Solove to see a psychologist who found he had a full-scale IQ of 83 and displayed signs of neglect and deprivation. He lacked age-appropriate empathy and had difficulty with dependency, intimacy and cooperation. According to

the doctor, Mr. Solove displayed a poor self-image and acted out to compensate for his negative feelings. He recommended he continue therapy.

Mr. Solove and Raymond's next foster family was the one that would eventually adopt them: the Soloves. Darlene Solove was Mr. Solove's maternal great-aunt. She and her husband, Daniel, had a daughter Sarah, who was a few years older than Mr. Solove was. Though the latest version of "family" was actually blood-related, the result was the same. Mr. Solove continued to act out with property destruction, lying and manipulation, and inappropriate defecation and urination. He wore a diaper until he was 12 years old. To make matters worse, he also continued his inappropriate sexual behavior. At age six, he exposed himself to Sarah and tried to touch her. He also attempted to pull down Raymond's pants and later asked him for oral sex.

Though the Soloves lasted longer than the Consentinos, the Moraleses, or the Allams, they too eventually tried to give up. In 2001, two years after they finalized their adoption of the boys, they contacted the Department of Human Services and tried to give them back to the Commonwealth, advising the caseworker the boys "repulsed them." While they were successful in returning Raymond, they eventually decided to keep Mr. Solove.

Mr. Solove moved out of his adoptive parents' home as soon as he could. At 14, he started smoking marijuana daily, unknowingly self-medicating for the depression and anxiety his traumatic childhood had caused. While he stopped smoking around the time his daughter was born, his anxiety and depression did not. In fact, they

worsened. He soon found himself in the emergency room complaining of chest pain, thinking he was having a heart attack. It was a panic attack, an event that repeated itself multiple times over the next year and half. Beginning treatment at South County Mental Health, hospital staff asked him why he admitted himself and he told them: he was having disturbing thoughts about his daughter. Neither his thoughts nor his actions in this case were a coincidence. He is a product of the childhood he lived.

## CONCLUSION

At sentencing, Mr. Solove seeks a dim light at the end of a long tunnel. He knows he committed acts for which many would simply lock him up and throw away the key. He has also suffered greatly in his life. He is in trouble and in pain. He acknowledges he deserves punishment. He just hopes this Court will have the "generosity of spirit" the Second Circuit wrote about in *Singh*.

WHEREFORE, the Defendant, Robert Solove, respectfully requests this Court grant this motion for a downward variance.

Respectfully submitted,

MICHAEL CARUSO
FEDERAL PUBLIC DEFENDER

*s/Scott Berry*
Scott Berry, B.C.S.
Assistant Federal Public Defender
Attorney for Defendant
Bar Number: 0525561
450 South Australian Ave., Suite 500
West Palm Beach, Florida 33401
Phone: (561) 833-6288
Email: scott_berry@fd.org

CERTIFICATE OF SERVICE

    I hereby certify that on May 10, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

                                    *s/ Scott Berry*
                                    Scott Berry